# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————————

N⁰ 06-CV-5013 (JFB) (ARL)

————————————————

THE SHINNECOCK INDIAN NATION,

Plaintiff,

VERSUS

DIRK KEMPTHORNE, SECRETARY OF THE DEPARTMENT OF THE INTERIOR, JAMES E. CASON, ASSOCIATE DEPUTY SECRETARY OF THE DEPARTMENT OF THE INTERIOR, AND THE UNITED STATES DEPARTMENT OF THE INTERIOR,

Defendants.

————————————————

MEMORANDUM AND ORDER
September 30, 2008

————————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff the Shinnecock Indian Nation (the "Nation" or "plaintiff"), brings this action against defendants Dirk Kempthorne, Secretary of the Department of the Interior, James E. Cason, Associate Deputy Secretary of the Department of the Interior, and the United States Department of the Interior (collectively, "Interior" or "defendants"), pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 (the "APA"), arising from Interior's alleged continuing refusal to acknowledge the federal Indian tribal status of the Nation, as well as Interior's alleged refusal to fulfill its trust obligations regarding the Nation's land claim pursuant to the Indian Non-Intercourse Act of 1834, 25 U.S.C. § 177 (the "NIA").

In particular, the Nation's First Amended Complaint asserts the following four APA claims against Interior: (1) that Interior violated and continues to violate the APA and the Due Process Clause of the Fifth Amendment by refusing to acknowledge that the Nation is an Indian tribe entitled to the substantive rights, protections, and assistance flowing from that status under federal law, and that such refusal constitutes a deprivation of valuable property and other rights of the Nation and its members; (2) that Interior violated and continues to violate the APA and the NIA by continuing to deny the Nation's request to Interior, in 2005, that Interior join in a land claim filed by the Nation and, specifically, through Interior's refusal to investigate and take such action as may be warranted under the circumstances with

respect to this land claim pursuant to the NIA; (3) that Interior violated and continues to violate the APA and the Federally Recognized Indian Tribes Act of 1994, 25 U.S.C. § 479a *et seq.* (the "List Act"), by failing to include the Nation on Interior's two most recently published lists of federally-recognized Indian tribes; and (4) that Interior violated and continues to violate the APA and the Federal Acknowledgment Regulations, 25 C.F.R. 83 (the "Part 83 regulations") by unreasonably delaying Interior's decision on the Nation's petition for federal acknowledgment for many years.

The first and third claims are premised on the Nation's contention that it has already been acknowledged as an Indian tribe, in the past, by all three branches of government. First, the Nation contends that Interior and the Commission of Indian Affairs recognized the Nation in 1915 and confirmed its recognition in reports from 1916 to 1958. Second, the Nation asserts that Congress recognized the Shinnecock Indians, the Shinnecock Indian Reservation, and the Shinnecock Nation in 1948 and 1950 in legislation allocating federal, state, and tribal jurisdiction over Indians and Indian Reservations in New York State. Finally, the Nation argues that the 2005 decision by the Honorable Thomas C. Platt in *New York v. Shinnecock Indian Nation*, *see* 400 F. Supp. 2d 486 (E.D.N.Y. 2005), which found "that the Shinnecock Indians are in fact an Indian Tribe" as a matter of federal common law under *Montoya v. United States*, 180 U.S. 261 (1991) and *United States v. Candelaria*, 271 U.S. 432 (1926), 400 F. Supp. 2d at 489, has the legal effect of federal recognition equivalent to recognition by Interior or Congress.

Defendants now move to dismiss the First Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, with the exception of the Nation's "unreasonable delay" claim under the APA, the claims must be dismissed as a matter of law because there is no legal basis for this Court to review the "recognition" issue under the APA until there has been a final agency action with respect to the petition. The issue of federal recognition of an Indian tribe is a quintessential political question that, in the first instance, must be left to the political branches of government and not the courts. In Article I, Section 8 of the United States Constitution, our Founding Fathers explicitly granted Congress the authority to regulate commerce with Indian tribes and Congress has delegated general responsibility over matters pertaining to Indian tribes to the Department of the Interior. Although the Nation asserts that Congress recognized it as a Tribe and established a government-to-government relationship in legislation over fifty years ago, that legislation did no such thing. Similarly, although the Nation points to evidence that it was recognized at some point in the past by the Department of the Interior as an Indian Tribe, it is undisputed that Interior does not currently recognize a government-to-government relationship with the Nation and that its petition is still pending with Interior. Therefore, it is not the role of the court to usurp the constitutionally-protected province of the politically-elected branches of government by attempting to address the merits of the recognition issue before the Secretary of the Interior has acted.

Moreover, the 2005 court decision concluding that the Nation was an "Indian Tribe" under the common law standard does not, and cannot, alter this constitutional equation. In other words, although the Court clearly had the authority to determine the

common law tribe issue for purposes of deciding the limited issue before it, relating to the proposed construction of a casino on Shinnecock land, there is no legal authority for the proposition that such a judicial decision in a particular case allows a tribe to completely bypass the recognition procedure established by the political branches and create a government-to-government relationship through judicial fiat. In fact, in *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51 (2d Cir. 1994), the Second Circuit specifically noted the following: "The *Montoya/Candelaria* definition and the [Bureau of Indian Affairs (the "BIA")] criteria both have anthropological, political, geographical and cultural bases and require, at a minimum, a community with a political structure. The two standards overlap, *though their application might not always yield identical results*." 39 F.3d at 59 (emphasis added). Therefore, the Court cannot interfere at this juncture by reviewing the merits of the recognition issue pending with the Interior, but rather must await the outcome of that review. Accordingly, the first and third claims under the APA must be dismissed because there has not been a final agency action by Interior. The second claim, relating to Interior's failure to investigate and take action in connection with the Nation's 2005 land claim litigation, is similarly defective and must be dismissed because there was no final agency action.

Of course, even though the Court cannot review the merits of the recognition issue before Interior reaches its decision, the Court does have authority under the APA to review whether Interior has unreasonably delayed its decision on that issue. In particular, as noted above, the Nation has set forth detailed allegations in support of their contention that the petition has been pending for years with no action by Interior and that such delay is "unreasonable" under the APA. These allegations of complete inaction by Interior on the Nation's petition for many years, without a clear explanation, certainly constitutes a plausible claim for "unreasonable delay" that requires further inquiry by the Court and survives a motion to dismiss. If the Nation is ultimately successful on this "unreasonable delay" claim, the proper remedy is not for the Court to make the recognition decision ahead of Interior, but rather to direct that Interior make its decision within a certain, specified time frame. Thus, dismissal of the Nation's fourth claim for "unreasonable delay" under the APA is unwarranted and the parties will proceed with discovery on this issue, absent a binding commitment by Interior to a specific, reasonable timeframe for its final determination.

I. BACKGROUND

A. The APA and the Finality Principle

As stated *supra*, the Nation brought this lawsuit pursuant to the APA. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Specifically, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject" to such judicial review. 5 U.S.C. § 704. Thus, as the Second Circuit has observed, a "plaintiff may obtain judicial review of an action taken by an agency only if (1) it constitutes agency action, a term of art defined by the APA, and (2) the action was final." *Benzman v. Whitman*, 523 F.3d 119, 132 (2d Cir. 2008) (citations and quotation

marks omitted). In particular, the Second Circuit has explained that,

> [u]nder the APA, an action is "final" insofar as it is not a "preliminary, procedural, or intermediate agency action or ruling"; a ruling may be final whether or not it may be subject to appeal or reconsideration "unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative." [5 U.S.C. § 704.] The "core question" for determining finality is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."

*Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003) (quoting *Dalton v. Specter*, 511 U.S. 462, 470 (1994)). Further, "the finality requirement of Section 10(c) of the APA, 5 U.S.C. § 704, . . . is to be interpreted in a pragmatic way, with an eye toward protecting agencies from the disruption of piecemeal appeals and toward insuring that judicial review involves concrete disputes over meaningful interests, rather than abstract disputes over hypothetical governmental actions." *Nat'l Wildlife Federation v. Goldschmidt*, 677 F.2d 259, 263 (2d Cir. 1982) (citations omitted); *see also Acquest Wehrle LLC v. United States*, No. 06-CV-654C, 2008 U.S. Dist. LEXIS 47936, at *19 (W.D.N.Y. June 20, 2008) ("The APA's explicit requirement that the agency action be 'final' before the claim for review can be brought in federal court is jurisdictional, and serves several functions: For example: It allows the agency an opportunity to apply its expertise and correct its mistakes, it avoids disrupting the agency's processes, and it relieves the courts from having to engage in piecemeal review which is at the least inefficient and upon completion of the agency process might prove to have been unnecessary.") (citation and quotation marks omitted).

## B. The Constitutional, Statutory, and Regulatory Framework for Federal Tribal Recognition

### (1) The Authority of Congress and Its Delegation to Interior

Article I, Section 8 of the United States Constitution grants Congress the authority to regulate commerce with Indian tribes. *See* U.S. Const. Art. I, § 8. Congress has delegated implementation of its statutes dealing with Indian affairs to Interior. *See* 43 U.S.C. § 1457. In particular, in 1832, "Congress established the position of Commissioner of Indian Affairs (currently within the Department of the Interior) and delegated to the Commissioner the authority to manage all Indian affairs." *Golden Hill*, 39 F.3d at 57. "The Department of the Interior did not actively begin to engage in recognition determinations until after the passage of the Indian Reorganization Act of 1934. After passage of the Indian Reorganization Act recognition proceedings were necessary because the benefits created by it were made available only to descendants of 'recognized' Indian tribes." *Golden Hill*, 39 F.3d at 57 (citation omitted) (quoting 25 U.S.C. § 479). Interior is bound to publish in the Federal Register "a list of all Indian tribes entitled to receive services from the Bureau [of Indian Affairs (the "BIA")] by virtue of their status

as Indian tribes." 25 C.F.R. § 83.5(a); 25 U.S.C. § 479a.

## (2) Petitioning for Federal Recognition

In 1978, Interior promulgated the Part 83 regulations, which establishes the process for the review and approval of petitions for acknowledgment of Indian tribes. *See* 25 C.F.R. §§ 83.1-83.13; *see also* 43 Fed. Reg. 39361 (1978); 59 Fed. Reg. 9280 (1994). According to these regulations, the BIA's approval of a tribe's petition under Part 83 "is a prerequisite to the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes. Acknowledgment shall also mean that the tribe is entitled to the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations and obligations of such tribes. Acknowledgment shall subject the Indian tribe to the same authority of Congress and the United States to which other federally acknowledged tribes are subjected." 25 C.F.R. 83.2.

## (3) The Procedure for Petitions

Under the Part 83 regulations, Indian groups apply for acknowledgment by filing a "documented petition" that must provide "thorough explanations and supporting documentation" demonstrating that the petitioner meets the seven mandatory criteria set forth in the regulations. *See* 25 C.F.R. §§ 83.6(c), 83.7. The burden of proof is on the petitioning group to submit evidence that establishes each of the following seven criteria: (a) the petitioner has been identified as an American Indian entity on a substantially continuous basis since 1900; (b) a predominate portion of the petitioning group comprises a distinct community from historical times until the present; (c) the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history; (d) a copy of the group's present governing document or, in its absence, a statement describing in full its membership criteria and current governing procedure; (e) the group's membership consists of individuals who descend from a historical Indian tribe or from historical tribes which combined and functioned as a single autonomous entity; (f) the membership of the petitioning group is composed principally of persons who are not members of any other North American Indian tribe; and (g) Congress has not expressly terminated or forbidden a Federal relationship with the group. *See id.* § 83.7(a)-(g).

Upon receipt of a documented petition under the regulations, the Assistant Secretary - Indian Affairs ("AS-IA") reviews the petition and its supporting documentation and provides technical assistance regarding additional research needed to support the petitioner's claims. *See id.* § 83.10(b). Interested parties, such as the relevant state governors and attorneys general, are provided notice of the petition and the opportunity to become active participants in the process, along with other third parties, such as local governments, other federally recognized Indian tribes, and other non-recognized Indian groups that might be affected by an acknowledgment determination. *See id.* §§ 83.1, 83.9.

Once AS-IA determines that the documentation in the petition is adequate to permit a full review, the petition is considered "ready" for a full evaluation by the AS-IA and

is placed on the "Ready, Waiting for Active Consideration" list (the "ready list"). *See id.* § 83.10(d). The acknowledgment regulations specify that "[t]he order of consideration of documented petitions shall be determined by the date of the Bureau's notification to the petitioner that it considers that the documented petition is ready to be placed on active consideration." *See id.*

The actual evaluation of the petition and its evidence under the regulatory criteria by the agency professional staff occurs during "active consideration." During active consideration, the AS-IA continues the review and publishes proposed findings in the Federal Register. *See id.* §§ 83.10 (g), (h). The proposed findings are preliminary decisions as to whether the petitioning group meets the regulatory criteria based on the documentation before the agency at the time.

After issuance of notice in the Federal Register of the proposed findings, there is a public comment period of 180 days, with extensions granted for good cause. *See id.* § 83.10(i). During this time period, the AS-IA provides informal and formal technical assistance, and petitioners and third parties may submit additional arguments and evidence in support of, or in opposition to, the proposed findings. *See id.* § 83.10(i), (j). Following the close of the public comment period, the petitioner has a reply period, during which it responds to comments submitted during the public comment period. *See id.* § 83.10(k).

Following consultation, *id.* § 83.10(l), the final phase of active consideration begins. The OFA professional staff evaluates the evidence in the record, prepares a summary of the evidence under the regulatory criteria and recommends to the AS-IA whether the petitioner meets the criteria. The AS-IA then issues a final determination on the status of the petitioner. *See id.* § 83.10(l)(2). This determination is not deemed to be a final and effective agency action, however, unless a period of 90 days passes without the filing of a request for reconsideration with the Interior Board of Indian Appeals ("IBIA"). *See id.* § 83.11(a)(2). If there is a request for reconsideration before the IBIA, the IBIA may affirm or vacate the final determination, or refer issues to the Secretary of the Interior (the "Secretary") for further response or evaluation. *See id.* §§ 83.11(e), (f).

## C. The Nation's Federal Acknowledgment Petition

As stated *supra*, plaintiff has filed a petition with Interior for federal tribal recognition pursuant to the Part 83 regulations. Set forth below are facts regarding the history of this petition that are relevant to the instant motion.[1]

### (1) Facts Contained in the Complaint

According to the complaint, the Nation filed a petition for federal tribal recognition in 1978. (Compl. ¶ 3.) Plaintiff alleges that, at the time it was filed, the petition was "fourth in order of priority of consideration" based on applicable regulations. (Compl. ¶ 86.) Subsequently, "for more than fifteen years the Department failed to take any action" on the petition, including any notification to the

---

[1] These facts are taken from the First Amended Complaint ("Compl." or the "complaint") and are not findings of fact by the Court. The Court assumes these facts to be true for the purpose of deciding this motion and construes them in the light most favorable to plaintiff, the non-moving party.

Nation of any obvious deficiencies or significant omissions in the petition, (Compl. ¶¶ 88, 91), even though the regulations in place at that time required the Interior to make such notification if applicable. (Compl. ¶ 88.)

In particular, the complaint states that, in 1994, Interior amended the regulations under which the Nation first filed its petition. (Compl. ¶ 92.) As a consequence, and "[a]lthough it had never withdrawn the petition and had never been notified by the Department of any obvious deficiencies or significant omissions in that petition," the Nation filed another petition in September 1998. (Compl. ¶ 95.)

According to plaintiff, "[o]n or about December 22, 1998, the Department issued a Technical Assistance Letter to the Nation, requesting additional information. The Nation responded to the Technical Assistance Letter in February 2003." (Compl. ¶ 96.)

Plaintiff further alleges that, "[o]n or about September 9, 2003, the Department notified the Nation that it deemed the Shinnecock Nation's acknowledgment petition 'ready' and awaiting active consideration." (Compl. ¶ 97.) However, "[o]n or about July 26, 2006, the Department issued a second Technical Assistance Letter to the Nation. The Nation responded to the second Technical Assistance Letter on or about November 22, 2006." (Compl. ¶ 98.)

According to the Nation, "[t]o date, nearly thirty years from the Nation's initial filing of its 1978 acknowledgment petition, and nearly nine years after the filing of its supplemental 1998 acknowledgment petition, the Department has not yet undertaken active consideration of the Nation's Petition." (Compl. ¶ 99.) Further, plaintiff alleges that

the "Department has advised the Nation that it believes it may take as long as until the year 2014 before the Department may make a final determination on the Nation's Petition, without binding itself even to this schedule." (Compl. ¶ 99.)

### (2) Facts That Developed After This Motion Was Briefed

By letter dated May 23, 2008, after this motion was fully briefed, defendants notified the Court of a new policy promulgated by Interior that would permit tribes that meet certain criteria to bypass the regulatory priority order described *supra*. Interior enclosed a letter it had sent to plaintiff, also dated May 23, 2008, informing plaintiff that the Nation "is the only petitioner presently on the 'Ready' list that might qualify under the new waiver policy. . . . If the genealogical documentation so indicates, the Shinnecock petition will be eligible under this policy to be the top petition on the 'Ready' list." (Letter from Carl J. Artman, dated May 23, 2008, at 2.) Interior further stated that, "[a]ssuming the genealogical documentation indicates that the Shinnecock petitioner is eligible for a waiver under this new policy, the Department would anticipate placing the Shinnecock petition on active consideration in the late fall of 2008." (Letter from Carl J. Artman, dated May 23, 2008, at 2.)

Subsequently, in accordance with a request the Court made during a conference on June 19, 2008, the parties conferred regarding a potential time limit for the remainder of the acknowledgment process and submitted a letter regarding the status of these negotiations on August 6, 2008. According to this letter, although defendants agreed in theory to set a time limit for plaintiff's petition, the parties could not agree as to the

level of "supervision and enforcement by the Court of Defendants' compliance with the proposed timeframes." (Status Letter, dated August 6, 2008, at 2.)

## II. Procedural History

The Nation filed its initial complaint in this action on September 14, 2006. Defendants moved to dismiss this initial complaint on February 16, 2007, plaintiff responded on March 16, 2007, and defendants submitted their reply on March 30, 2007. The Court held oral argument on June 19, 2007 (the "June argument"). Following the June argument, and prior to any Court decision on the pending motion, plaintiff requested an opportunity to amend the initial complaint, which the Court granted. On October 5, 2007, plaintiff filed its First Amended Complaint, which is the subject of the instant motion. On December 14, 2007, defendants moved to dismiss the complaint. Plaintiff responded on February 15, 2008, and defendants submitted their reply on March 7, 2008. On April 18, 2008, the Court held oral argument (the "April argument").[2] By letters dated May 12, 2008 and May 23, 2008, the Nation and defendants, respectively, provided supplemental documents to the Court. Further, on August 6, 2008, at the Court's request, the parties submitted the status report described *supra*.

---

[2] By letter to the Court dated May 8, 2008, the Nation requested leave to file a second amended complaint. The Court granted such leave and plaintiff filed a second amended complaint on August 15, 2008. The parties are presently briefing defendants' motion to dismiss the second amended complaint, which raises two new claims that are wholly discrete from those at issue on the instant motion. The Court will not, therefore, address herein the new claims contained in the second amended complaint.

## III. Standard of Review

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In reviewing a motion to dismiss under Rule 12(b)(1), the court "must accept as true all material factual allegations in the complaint, but we are not to draw inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004) (citation omitted). Moreover, the court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but we may not rely on conclusory or hearsay statements contained in the affidavits." *Id.* (citations omitted). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The plaintiff must satisfy "a flexible 'plausibility' standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations

in the complaint." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007). The Court does not, therefore, require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is plausible on its face." *Id.* at 1974. Further, in reviewing a motion to dismiss under Rule 12(b)(6), "the district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). The Court may only consider a document not appended to the complaint if the document is "incorporated in [the complaint] by reference" or is a document "upon which [the complaint] *solely* relies and . . . is *integral to the complaint*." *Id.* (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (emphases in original). Courts also "'routinely take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted in other litigation, but rather to establish the fact of such litigation and related filings.'" *Crews v. County of Nassau*, No. 06-CV-2610 (JFB), 2007 U.S. Dist. LEXIS 6572, at *5 n.2 (E.D.N.Y. Jan. 30, 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

"A court presented with a motion to dismiss under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6) must decide the 'jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction.'" *Coveal v. Consumer Home Mortgage, Inc.*, No. 04-CV-4755 (ILG), 2005 U.S. Dist. LEXIS 25346, at *7 (E.D.N.Y. Oct. 21, 2005) (quoting *Magee v. Nassau County Med. Ctr.*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998)); *see also Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (noting that a motion to dismiss for failure to state a claim may be decided only after finding subject matter jurisdiction).

## IV. THE COURT PRESENTLY LACKS JURISDICTION OVER CLAIMS ONE AND THREE BECAUSE THESE CLAIMS POSE NON-JUSTICIABLE POLITICAL QUESTIONS AND INTERIOR HAS NOT TAKEN "FINAL" ACTION ON THE NATION'S PETITION UNDER THE APA

As stated *supra*, claims one and three of the complaint allege that Interior violated and continues to violate the Nation's rights by refusing to acknowledge that the Nation is an Indian tribe under federal law and to include the Nation on the list. Consequently, plaintiff seeks "to compel inclusion of the Nation" on the list by means of this lawsuit. (Compl. ¶ 2.)

Defendants, however, seek to dismiss claims one and three on the grounds that the political question doctrine and the finality requirements of the APA preclude judicial review of these claims at this time, prior to Interior's issuance of a final determination of plaintiff's federal tribal status. In response, plaintiff argues that the political question doctrine does not bar the Nation's claims because, "in fact, [the Nation] already has been federally recognized as an Indian tribe" by all three branches of government and, therefore, "is entitled as a matter of law promptly to be placed" on the list. (Compl. ¶ 4.) Similarly, the Nation argues that any one component of the alleged, previous tripartite recognition is sufficient to create a legal obligation on the part of Interior to place plaintiff on the list and, therefore, Interior's failure to do so qualifies as final agency action under the APA. (Pl.'s Mem. at 23-24.) For the reasons set forth below, the Court disagrees with plaintiff on both grounds and

concludes that the political question doctrine operates to preclude judicial review of claims one and three at this juncture because the factual and legal premise set forth in the complaint for compelling federal recognition fails as a matter of law under the circumstances of this case. Thus, at this premature stage in the Nation's administrative proceedings with Interior, *i.e.,* prior to Interior's issuance of a decision on the Nation's petition that is "final" for purposes of APA review, the Constitution does not empower this Court to provide the relief plaintiff seeks and the Court will not, as plaintiff urges, provide such relief by judicial fiat.

### A. Legal Standard

As the Court sets forth below, and as the Second Circuit has explicitly recognized, the issue of federal recognition of an Indian tribe – *i.e.,* inclusion of an Indian tribe on the list for purposes of establishing, among other things, a government-to-government relationship with the United States – is a political question that, in the first instance, must be left to the political branches of government and not the courts.

As the Second Circuit has explained,

the political question doctrine is a function of the constitutional framework of separation of powers. Although prudential considerations may inform a court's justiciability analysis, the political question doctrine is essentially a constitutional limitation on the courts. Just as Congress may not confer jurisdiction on Art. III federal courts to render advisory opinions, or to entertain friendly suits, it may not require courts to resolve political questions, because suits of this character are inconsistent with the judicial function under Art. III. Thus, where adjudication would force the court to resolve political questions, the proper course for the courts is to dismiss.

*767 Third Avenue Assocs. v. Consulate General of Socialist Federal Republic of Yugoslavia*, 218 F.3d 152, 164 (2d Cir. 2000) (citations and quotation marks omitted). As the Second Circuit has also recognized, a "nonjusticiable" political question would ordinarily involve one or more of the following factors:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of being decided without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements

by various departments on one question."

*Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995), *cert. denied* 518 U.S. 1005 (1996) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

Applying these principles against the constitutional, statutory, and regulatory background the Court described *supra*, the Second Circuit has held that federal recognition of Indian tribes, *i.e.,* recognition for the purpose of obtaining the benefits described in the Rule 83 regulations, such as a government-to-government relationship with the United States, poses such a political question for Congress – or, by delegation, the BIA – to decide in the first instance, and for federal courts to review pursuant to the APA only after a final agency determination. *See Golden Hill*, 39 F.3d at 60 ("The BIA has the authority to prescribe regulations for carrying into effect any act relating to Indian affairs. . . . The Department of the Interior's creation of a structured administrative process to acknowledge 'nonrecognized' Indian tribes using uniform criteria, and its experience and expertise in applying these standards, has now made deference to the primary jurisdiction of the agency appropriate."); *see also Arakaki v. Lingle*, 477 F.3d 1048, 1067 (9th Cir. 2007) ("[I]f the question before us were whether a remedy would lie against Congress to compel tribal recognition, the answer would be readily apparent. . . . A suit that sought to direct Congress to federally recognize an Indian tribe would be nonjusticiable as a political question.") (quoting *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1275-76 (9th Cir. 2004)); *Samish Indian Nation v. United States*, 419 F.3d 1355, 1373-75 (Fed. Cir. 2005) ("To be sure, by adopting the acknowledgment criteria the government voluntarily bound its process within the confines of its regulations, subject to APA review by the courts. But that limitation alters neither the commitment of the federal recognition determination to the political branches, nor the regard for separation of powers that precludes judicial evaluation of those criteria in the first instance. The political determination may be circumscribed by regulation, but it is still a political act. The regulations create a limited role for judicial intervention, namely, APA review to ensure that the government followed its regulations and accorded due process. Thus, under the acknowledgment regulations, the executive -- not the courts -- must make the recognition determination.") (citations and quotation marks omitted); *Miami Nation of Indians of Indiana, Inc. v. United States Dept. of the Interior*, 255 F.3d 342, 347-48 (7th Cir. 2001), *cert. denied* 2002 U.S. LEXIS 672 (June 15, 2001) ("It comes as no surprise . . . that the action of the federal government in recognizing or failing to recognize a tribe has traditionally been held to be a political one not subject to judicial review. . . . But this conclusion assumes that the executive branch has not sought to canalize the discretion of its subordinate officials by means of regulations that require them to base recognition of Indian tribes on the kinds of determination, legal or factual, that courts routinely make. By promulgating [the Part 83 regulations] the executive brings the tribal recognition process within the scope of the [APA].") (citation and quotation marks omitted); *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 550 (10th Cir. 2001) ("We have indicated that exhaustion is required when, as here, a plaintiff attempts to bypass the regulatory framework for establishing that an Indian group exists as an Indian tribe. . . . '"[T]he judiciary has historically deferred to executive and legislative determinations of tribal recognition,"' and . . . continuing such deference is justified by Congress' broad

power over Indian affairs.") (quoting *Western Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1057 (10th Cir. 1993)); *James v. United States Department of Health and Human Services*, 824 F.2d 1132, 1135 (D.C. Cir. 1987) ("Regulations establishing procedures for federal recognition of Indian tribes certainly come within the area of Indian affairs and relations. Further, requiring exhaustion allows the Department of the Interior the opportunity to apply its developed expertise in the area of tribal recognition. The Department of the Interior's Branch of Acknowledgment and Research was established for determining whether groups seeking tribal recognition actually constitute Indian tribes and presumably to determine which tribes have previously obtained federal recognition, *see* 25 C.F.R. § 83.6(b). The Branch staffs two historians, two anthropologists, and two genealogical researchers and has evaluated some twenty petitions for federal acknowledgment. It is apparent that the agency should be given the opportunity to apply its expertise prior to judicial involvement."); *Puzz v. United States Dept. of Interior*, No. C 80-2908, 1984 U.S. Dist LEXIS 23096, at *8 (N.D. Cal. 1984) ("[Q]uestions of the status of particular tribes are political questions that the courts ought not undertake to resolve.") (citing *Baker*, 369 U.S. at 215-17); *see generally United States v. Holliday*, 70 U.S. 407, 419 (1866) ("In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court [m]ust do the same. If they are a tribe of Indians, then, by the Constitution of the United States, they are placed, for certain purposes, within the control of the laws of Congress.").

### (2) Application

Here, as stated *supra*, plaintiff argues that the political question doctrine does not preclude the Court from "compelling" Interior to place the Nation on the list because all three branches of government have already recognized the Nation as a tribe. However, for the reasons set forth below, the Court wholly disagrees and finds that the political question doctrine forecloses judicial review of the Nation's federal tribal status at this juncture.

### (1) Alleged Congressional Recognition

Plaintiff first claims that Congress has already classified the Nation as a federally-recognized Indian tribe. Specifically, plaintiff alleges that,

> in 1948 and 1950, respectively, Congress passed legislation granting New York civil and criminal jurisdiction over Indians on *all* Indian reservations in that State, after having been expressly informed by a Department official in congressional hearings that the Indians and the two Indian reservations on Long Island, New York (which necessarily included the Shinnecock Indians and the Shinnecock Indian Reservation[]), were among the Indians and Indian reservations in New York.

(Compl. ¶ 7.)

In particular, the 1948 statute, entitled "Jurisdiction of New York State over offenses committed on reservations within State," states:

> The State of New York shall have jurisdiction over offenses committed by or against Indians on Indian reservations within the State of New York to the same extent as the courts of the State have jurisdiction over offenses committed elsewhere within the State as defined by the laws of the State: Provided, That nothing contained in this Act [this section] shall be construed to deprive any Indian tribe, band, or community, or members thereof, [of] hunting and fishing rights as guaranteed them by agreement, treaty, or custom, nor require them to obtain State fish and game licenses for the exercise of such rights.

25 U.S.C. § 232.

Further, the 1950 statute, entitled "Jurisdiction of New York State courts in civil actions," states:

> The courts of the State of New York under the laws of such State shall have jurisdiction in civil actions and proceedings between Indians or between one or more Indians and any other person or persons to the same extent as the courts of the State shall have jurisdiction in other civil actions and proceedings, as now or hereafter defined by the laws of such State. . . .

25 U.S.C. § 233. According to plaintiff, "[n]othing in the language of the two bills indicates any intention that the proposed legislation would not apply to the Shinnecock Indian Reservation and the Shinnecock Indians." (Compl. ¶ 70.) Moreover, plaintiff argues that the legislative history of these statutes demonstrates that they applied to the Nation. (Pl.'s Mem. at 11.)[3] Thus, plaintiff contends, Congress has already recognized the Nation for purposes of, among other things, establishing a government-to-government relationship with the United States and the Court should, therefore, compel Interior to place the Nation on the list. For the reasons set forth below, however, the Court rejects

_____

[3] Interior rebuts plaintiff's attempt to resort to legislative history by noting that the fact that Congress did not confer federal recognition on the Nation in 1948 or 1950 is strongly supported by a finding of a Congressional commission in the mid-1970s that the Nation was not a recognized Tribe. Specifically, defendants point out that Congress created the American Indian Policy Review Commission in 1975 in order to "conduct a comprehensive review of the historical and legal developments underlying the Indians' unique relationship with the Federal Government in order to determine the nature and scope of necessary revisions in the formulation of policies and programs for the benefit of Indians," including "an examination of the statutes and procedures for granting Federal recognition and extending services to Indian communities and individuals." 88 Stat. 1911, Section 2(3). In 1977, the American Indian Policy Review Commission issued its "Final Report," which included a "Chart of Available Information on Nonfederally Recognized Indian Tribes." (_See_ Defs.' Reply, Exh. A.) The "Shinnecock Tribe: Southampton" appears on this list. (_Id._)

this argument pursuant to well-settled principles of statutory construction.

According to the Supreme Court, "canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citations and quotation marks omitted); *see also Estate of Barbara Pew v. Cardarelli*, 527 F.3d 25, 30 (2d Cir. 2008) ("We first look to the statute's plain meaning; if the language is unambiguous, we will not look farther.") (citations and quotation marks omitted). Consequently, as the Second Circuit has held regarding the limited role of legislative history in statutory interpretation, "[w]hen a statute's language is clear, our only role is to enforce that language according to its terms. We do not resort to legislative history to cloud a statutory text that is clear even if there are contrary indications in the statute's legislative history." *Arciniaga v. General Motors Corp.*, 460 F.3d 231, 236 (2d Cir. 2006), *cert. denied* 2006 U.S. LEXIS 9491 (Dec. 11, 2006) (citations and quotation marks omitted); *see also Green v. City of New York*, 465 F.3d 65, 78 (2d Cir. 2006) ("Statutory analysis begins with the text and its plain meaning, if it has one. Only if an attempt to discern the plain meaning fails because the statute is ambiguous, do we resort to canons of construction. If both the plain language and the canons of construction fail to resolve the ambiguity, we turn to the legislative history.") (citations and quotation marks omitted); *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms. Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous.") (citations omitted).

Here, the Court has carefully reviewed the statutes that, according to plaintiff, constituted federal recognition of the Nation and finds that they plainly and unambiguously do nothing of the sort. These statutes relate, respectively, to New York State's jurisdiction over crimes committed on Indian reservations and civil actions involving Indian litigants. The statutes do not pertain to tribal recognition – either explicitly or implicitly – nor do they even mention the Nation by name. According to the Supreme Court and Second Circuit, therefore, the Court should not – and, thus, will not – consult legislative history in order to strain these statutes beyond their plain and unambiguous meaning.[4] As this Court and other courts have warned,

_____

[4] The Court is aware that plaintiff points to the decision in *Bess v. Spitzer*, 492 F. Supp. 2d 191, 203-05 (E.D.N.Y. 2006), which noted that 25 U.S.C. § 232 is the basis for New York State's criminal jurisdiction over Shinnecock Indians, as purported evidence of "the continued vitality of the federal jurisdiction over and federal acknowledgment of the Shinnecock Indian Nation. . . ." (Pl.'s Mem. at 12.) Plaintiff's argument is unavailing. The so-called "vitality" of federal criminal jurisdiction over the Nation is not at issue here. The key question is whether the federal government has recognized the Nation for purposes of obtaining particular government benefits – such as a government-to-government relationship with the United States – not whether the federal government "acknowledge[s]" the existence of the Nation's members for purposes of enforcing state criminal laws. *Bess*, therefore, is wholly inapposite.

divorcing statutory interpretation from the plain language of the text and instead utilizing legislative history to somehow discern Congressional intent is a precarious exercise by the non-elected branch of government that could lead to results, including the creation of statutory rights, that were never intended by Congress, but rather simply represented misguided efforts by a court to glean such intent, regardless of the plain text, from the murky waters of legislative history. *See, e.g., U.S. ex rel. Fullington v. Parkway Hosp., Inc.*, 351 B.R. 280, 286 n.4 (E.D.N.Y. 2006) ("The Supreme Court has emphasized the dangers in courts interpreting statutes by relying on remarks from floor debates or similar comments by lawmakers to discern legislative intent.") (citations omitted).

In sum, although plaintiff argues that these statutes in 1948 and 1950 reflect federal recognition of the Nation by Congress, the plain and unambiguous language of these statutes does no such thing and, thus, any claim of federally-recognized tribal status based on such statutes fails as a matter of law.[5]

(2) Alleged Recognition by Interior

Second, as stated *supra*, the Nation also claims, as with Congress, that Interior has previously classified plaintiff as a federally recognized Indian tribe. The complaint contains a summary of the historical evidence that the Nation argues supports their position. For example, plaintiff points to a letter dated December 26, 1914 from John R.T. Reeves of the Indian Office (which, according to plaintiff, was a predecessor of the BIA), to the Commissioner of Indian Affairs (the "1914 Reeves Report"). (Compl. ¶ 45.) The 1914 Reeves Report refers to the Nation as a "tribe[]." (Compl. ¶ 47; Pl.'s Exh. C.) As plaintiff points out, "[t]he 1914 Reeves Report also reviews the status of each of the Indian reservations under federal jurisdiction that he determined to exist in New York, and included within that category the 'Shinnecock Reservation.'" (Compl. ¶ 48; *see also* Pl.'s Exh. C.) Moreover, plaintiff notes that "the 1914 Reeves report asserted the inalienability of lands possessed by the New York Indians, including lands of the Shinnecock Indians. . . ." (Compl. ¶ 49; *see also* Pl.'s Exh. C.) According to plaintiff, the 1914 Reeves Report thus demonstrates that,

> by no later than 1914, when the 1914 Reeves Report was prepared by the representative of the Indian Office of the Department of the Interior and submitted to Congress, the Department acknowledged the Shinnecock Indian Nation to be among the Indian tribes then existing in the State of New York that were subject to federal jurisdiction and supervision, with their tribal lands subject to the general restraint against alienation

---

[5] Thus, the Court need not consider plaintiff's argument that the Nation's status was never "terminated" by Congress and, therefore, the Court is empowered to compel Interior to put the Nation on the list. (Pl.'s Mem. at 12-13.) As described above, the plain and unambiguous language of the statutes that purportedly conferred federal tribal recognition demonstrate that Congress never accorded the Nation federal tribal status in the first instance. The question of the Nation's "termination" by Congress – and, relatedly, any jurisdiction this Court might have regarding such termination, (*see* Pl.s Mem. at 20-23) – is, therefore, logically irrelevant.

accorded to Indian lands by federal law.

(Compl. ¶ 51.) In addition, plaintiff points to various annual reports and other documents issued by Interior, generated as early as 1915, that refer to the Nation as an Indian tribe or that may otherwise imply that the Nation is an Indian tribe. (*See, e.g.,* Compl. ¶¶ 52-56, 63, 66-68, 71.) For the reasons set forth below, however, plaintiff's failure to obtain a final determination on the petition from the BIA precludes the Court from considering such historical evidence of alleged prior Interior recognition, particularly for the purpose of "compelling" Interior to put the Nation on the list.

As a threshold matter, the Court notes that the Second Circuit has not directly addressed whether historical evidence of alleged prior recognition by Interior – absent formal recognition by the BIA pursuant to the Part 83 regulations and consequent inclusion on the list – is sufficient to "compel" Interior to undertake such formal recognition. However, other courts have considered this precise issue and have held that historical evidence of such prior recognition is merely a factor to be considered by the BIA, which must issue a final determination according to the Part 83 regulations prior to judicial review.

For instance, in *James v. United States Department of Health and Human Services*, the District of Columbia Circuit considered a claim brought by members of the Gay Head Indian Tribe who "sought an order directing the Interior to place the Gay Heads on the list of recognized tribes," 824 F.2d at 1135, based in part upon historical evidence that the Executive Branch had already demonstrated such recognition, *id.* at 1136-37. Interior moved to dismiss the action because the Tribe had not formally petitioned the BIA for federal recognition and, therefore, had not obtained a final determination of the issue in order to make it ripe for judicial review. *Id.* at 1135. The district court agreed with Interior and the Tribe appealed. *Id.* In support of this appeal, the Tribe argued, as does the Nation in the instant case, that

> it would be redundant for them to exhaust administrative channels in an attempt to obtain federal recognition because the Gay Heads have already been recognized by the Executive Branch. They note that if the Executive Branch determines that a tribe of Indians is recognized, that decision must be respected by the Judicial Branch. Relying on this line of authority, they conclude that the Gay Head's recognition is locked in and the court below had a duty to order the Department of the Interior to place the Gay Head Tribe on the list of federally recognized tribes and therefore erred in concluding that exhaustion of administrative remedies was required.

*Id.* at 1137 (citations omitted). The District of Columbia Circuit, however, rejected this argument, holding that

> the determination whether [the historical evidence the tribe supplied] adequately support[] the conclusion that the Gay Heads were federally recognized in the middle of the nineteenth century, or whether other factors support federal recognition, should be

made in the first instance by the Department of the Interior since Congress has specifically authorized the Executive Branch to prescribe regulations concerning Indian affairs and relations. The purpose of the regulatory scheme set up by the Secretary of the Interior is to determine which Indian groups exist as tribes. That purpose would be frustrated if the Judicial Branch made initial determinations of whether groups have been recognized previously or whether conditions for recognition currently exist.

*Id.* at 1137 (citations omitted).

More recently, the Tenth Circuit had the opportunity to consider an argument similar to that made by the Tribe in *James* – and by the Nation in the case at bar – and relied on *James* to arrive at the same conclusion as the District of Columbia Circuit. Specifically, in *United Tribe of Shawnee Indians v. United States*, the Tenth Circuit reviewed the district court's dismissal of a tribe's request to bypass the Part 83 regulations and have the court compel inclusion on the list of federally-recognized tribes where the tribe relied, in part, on "historical events to assert that it was already federally recognized and that it therefore need not exhaust administrative channels." 253 F.3d at 550-51. In affirming the district court's dismissal for lack of jurisdiction, the Tenth Circuit explained:

> Determining whether a group of Indians exists as a tribe is a matter requiring the specialized agency expertise

the Court considered significant in [*McCarthy v. Madigan*, 503 U.S. 140 (1992)]. Moreover, the judicial relief [the Shawnee Tribe] requests would frustrate Congress' intent that recognized status be determined through the administrative process. Finally, exhaustion "may produce a useful record for subsequent judicial consideration, especially in a complex or technically factual context." These factors argue compellingly for requiring exhaustion.

*Id.* at 551 (citation omitted).

Similarly, in *Burt Lake Band of Ottawa and Chippewa Indians*, the District of Columbia relied on *James* and *United Tribe of Shawnee Indians* in rejecting the efforts of the Burt Lake Band of Ottawa and Chippewa Indians to compel the court to confer federal tribal recognition prior to a final BIA determination, on the grounds that historical evidence demonstrated previous recognition by the Executive Branch in the form of treaties:

> As *James* and *Shawnee* demonstrate, historical recognition by the Executive Branch does not allow a defendant to bypass BIA, even if the recognition occurred in a treaty. The fact that BIA's regulations include separate fast tracking provisions for groups claiming prior federal recognition makes all the more evident that federal

recognition does not allow an entity to completely bypass the BIA's recognition process. Accordingly, neither the Treaty of Washington nor the Treaty of Detroit excuses plaintiff from exhausting its administrative remedies.

217 F. Supp. 2d at 79 (citations omitted).

The Court finds these cases to be persuasive authority and, therefore, similarly holds that, although historical evidence of alleged prior federal recognition may be relevant to the BIA during the administrative process, the Court cannot consider such evidence absent a final determination by the BIA of the Nation's status.[6] Such premature consideration of historical evidence would frustrate the intent of Congress that a tribe's status be determined, in the first instance, by the Executive Branch of government pursuant to the political question doctrine, and would violate the finality requirements of the APA.

### (3) Alleged Federal Recognition by the Judiciary

Third, plaintiff argues that the judicial branch also accorded the Nation federal recognition. Specifically, as stated *supra*, plaintiff claims that such recognition was accomplished in 2005 in the context of an unrelated matter before Judge Platt –

---

[6] Thus, plaintiff's observation that the parties "have seriously conflicting views about the meaning and effect" of these historical documents, (Pl.'s Mem. at 10 n.4), has no bearing on the Court's analysis herein. As the courts in *James* and *United States Tribe of Shawnee Indians* persuasively observed, a federal court is not the proper forum to resolve such a conflict prior to the BIA's issuance of a final determination.

subsequently reassigned to the undersigned – concerning the potential construction of a casino on Shinnecock land (the "casino litigation"). As the Court sets forth below, however, the Second Circuit's holding in *Golden Hill* forecloses this argument. A court decision cannot accomplish federal recognition of an Indian tribe where the BIA has not yet issued a final determination.

According to plaintiff, Judge Platt "'recognized' the Shinnecock Nation as an Indian tribe within the meaning of" the List Act in his ruling on defendants' summary judgment motion in the casino litigation. (Compl. ¶ 115.) In this ruling, Judge Platt first observed that the casino litigation presented the question of whether the Nation fell "within the umbrella of the *Montoya v. United States*, 180 U.S. 261 (1901) and *Golden Hill*, 39 F.3d 51 line of cases and are not obligated under present circumstances to seek or obtain approval by the United States before proceeding to develop their properties." *New York v. Shinnecock Indian Nation*, 400 F. Supp. 2d at 491. The Court then held that "[t]he cases described above, beginning with *Montoya* and continuing to the present, establish a federal common law standard for determining tribal existence that the Shinnecock Indian Nation plainly satisfies." *Id.* at 492.

However, as set forth below, the Second Circuit in *Golden Hill* squarely distinguished the "federal common law" recognition reflected in Judge Platt's decision from federal recognition pursuant to the Part 83 regulations, described in detail *supra*. In particular, the Second Circuit held that such common law recognition is limited to the inquiry into whether an Indian group is a "tribe" for purposes of interpreting federal statutes, such as the NIA, and is wholly separate from the federal recognition plaintiff

seeks to obtain by means of the instant lawsuit.

In *Golden Hill*, the Second Circuit considered claims brought by the Golden Hill Paugussett Tribe of Indians pursuant to the NIA, which, in essence, prohibits "the sale by Indians of any land unless the sale was by public treaty made under the authority of the United States." 39 F.3d at 56. The district court had dismissed the claims because the Golden Hill tribe had not been federally-recognized by the BIA under the Part 83 regulations. *Id.* at 55. The Second Circuit remanded the case, explaining that the "Tribe's claim is not cognizable in the first instance solely by the BIA. In fact, the BIA lacks the authority to determine plaintiff's land claim. Regardless of whether the BIA were to acknowledge Golden Hill as a tribe for purposes of federal benefits, Golden Hill must still turn to the district court for an ultimate judicial determination of its claim under the Nonintercourse Act." *Id.* at 58. In particular, the Second Circuit premised its holding on the different standards established for tribal recognition under the NIA and the Part 83 regulations:

> Federal courts have held that to prove tribal status under the [NIA], an Indian group must show that it is "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." *See, e.g., United States v. Candelaria*, 271 U.S. 432, 442 (1926) (quoting *Montoya v. United States*, 180 U.S. 261, 266 (1901). . . . The formulation of this standard

and its use by the federal courts occurred after Congress delegated to the executive branch the power to prescribe regulations for carrying into effect statutes relating to Indian affairs, *see* 25 U.S.C. § 9, and without regard to whether or not the particular group of Indians at issue had been recognized by the Department of the Interior. . . .

\*\*\*

The *Montoya/Candelaria* definition and the BIA criteria both have anthropological, political, geographical and cultural bases and require, at a minimum, a community with a political structure. The two standards overlap, though their application might not always yield identical results. A federal agency and a district court are not like two trains, wholly unrelated to one another, racing down parallel tracks towards the same end. Where a statute confers jurisdiction over a general subject matter to an agency and that matter is a significant component of a dispute properly before the court, it is desirable that the agency and the court go down the same track – although at different times – to attain the statute's ends by their coordinated action.

39 F.3d at 59. In sum, the Second Circuit explicitly recognized the distinction between federal recognition and recognition under the common law.[7]

Here, to the extent plaintiff wishes to construe the 2005 decision to confer federal recognition upon the Nation – *i.e.,* recognition for purposes of, among other things, forming a government-to-government relationship with the United States – the Court would have had no legal authority to do so in that litigation. Indeed, the case presented the limited question of *Montoya* recognition – *i.e.,* common law recognition – and, therefore, the Court analyzed the Nation's status according to this common law standard.[8] Thus, consistent with the clear distinction between common law recognition and federal recognition outlined in *Golden Hill* – and in

keeping with the strictures of the political question doctrine, described *supra* – the issue of federal tribal status could not be determined by the Court in the course of the casino litigation, including the 2005 court decision to which plaintiff points. In other words, although the Court could and did determine common law tribal status in order to decide the issues presented in the casino litigation, that determination has no binding effect on the BIA for purposes of determining federal tribal recognition that would establish a government-to-government relationship.[9]

The Court is aware that plaintiff refers to "Congressional findings" contained in the List Act in an attempt to demonstrate that Congress has, in fact, empowered federal courts to determine the issue of federal tribal recognition prior to a final BIA determination. In particular, plaintiff points to the following "Congressional finding" in the List Act:

> (3) Indian tribes presently may be recognized by Act of Congress, by the administrative procedures set forth in Part 83 of the Code of Federal Regulations . . .; or by a decision of a United States Court.

25 U.S.C. § 479a (Congressional findings). For the reasons set forth below, that argument is without merit.

---

[7] As a matter of law, therefore, the Court rejects plaintiff's argument that, "[o]nce an Indian tribe has been determined to exist and to fall within the purview of federal legislation or federal common law protecting Indian tribes generally, effectively the tribe has been federally recognized, even though the initial determination was only for a discrete, limited purpose." (Pl.'s Opp. at 15.) As the Court explains *infra*, the Second Circuit's holding in *Golden Hill* directly forecloses this argument by drawing a clear distinction between federal recognition and recognition under the common law, and by explaining that the differing analyses for each form of recognition may also produce different results.

[8] Indeed, plaintiff appears to recognize that the 2005 court decision related to the common law standard for recognition, acknowledging that the Court in that decision "surveyed the record and distilled from the overwhelming evidence the Shinnecock Indian Nation's existence and rightful status a determination as a matter of federal common law that the Shinnecock Indians are in fact an Indian tribe." (Pl.'s Mem. at 13 (citation and quotation marks omitted).)

[9] Because the Court thus finds that the 2005 court decision could not confer federal tribal recognition establishing a government-to-government relationship – but could only decide common law recognition as it related to that lawsuit – any argument by plaintiff that defendants are collaterally estopped from contesting the issue of federal tribal recognition in the instant action is similarly without merit.

As a threshold matter, the Court recognizes that, "[n]ormally, congressional findings are entitled to much deference. *Thompson v. Colorado*, 278 F.3d 1020, 1033 (10th Cir. 2001), *cert. denied* 2002 U.S. LEXIS 3597 (May 20, 2002) (citing *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 n.12 (1985)). However, as courts routinely note, a Congressional finding does "not create a substantive right." *J.P. v. County Sch. Bd. of Hanover County, VA*, 447 F. Supp. 2d 553, 573 (E.D. Va. 2006); *see, e.g., Pennhurst v. Halderman*, 451 U.S. 1, 19 (1981) (explaining that a Congressional finding "is too thin a reed to support the rights and obligations read into it by the court below"). Here, plaintiff urges the Court to determine that Congress intended to create a significant substantive right – namely, the right to obtain federal tribal status through the federal courts in the absence of a final agency determination under the APA – but failed to include language referring to that right in the primary text of the statute itself.[10] The Court will not read such a significant, affirmative right into a statute, the actual language of which makes no reference to cloaking the judiciary with the co-equal role of the political branches in the federal recognition process.[11]

Moreover, although plaintiff again urges the Court to also resort to legislative history, including statements by Senators, to find the existence of such a power by the Courts, the Court again declines to do so and, instead, will rely on the text of the statutory language, which confers no power on the judiciary to bypass the elaborate federal recognition process through the Executive Branch that had existed for years, pursuant to federal regulations. In short, the "Congressional findings" in the List Act do not confer upon federal courts the authority to review a tribe's federal status for federal recognition purposes prior to the BIA's final determination.

Indeed, the very purpose of the Part 83 regulations (which Congress clearly did not disturb with the passage of the List Act) was, among other things, to remedy the piecemeal system of recognition that had existed previously, which included *ad hoc* recognition of tribes after courts found tribal status to exist for purposes of a particular case. *See Kahawaiolaa*, 386 F.3d at 1273 ("[P]rior to the late 1970's, the federal government recognized American Indian tribes on a case-by-case basis. In 1975, Congress established the American Indian Policy Review Commission to survey the current status of Native Americans. The Commission highlighted a number of inconsistencies in the Department of Interior tribal recognition process and special problems that existed with non-recognized tribes. As a result, in 1978, the Department of Interior exercised its delegated authority and promulgated [the Part 83 regulations] establishing a uniform procedure for acknowledging American Indian tribes.") (citations and quotation marks omitted). This historical context for the Congressional findings is consistent with "The Official Guidelines to the Federal Acknowledgment Regulations, 25 CFR 83," which plaintiff provided to the Court by letter

---

[10] Specifically, the List Act states that Interior must "publish in the Federal Register a list of all Indian tribes *which the Secretary recognizes to be eligible* for the special programs and services provided by the United States to Indians because of their status as Indians." 25 USC § 479a-1 (emphasis added). Thus, the text of the List Act solely refers to recognition by Interior – not the judiciary.

[11] Of course, the courts do have authority to review these determinations under the APA *after* the BIA's final determination.

dated May 12, 2008. These Guidelines explain that, "before 1978, requests from Indian groups for Federal acknowledgment as tribes were determined on an *ad hoc* basis. Some tribes were acknowledged by Congressional action. Others were done by various forms of administrative decision within the Executive Branch of the Federal Government, or through cases brought in the courts." The Court is aware that these Guidelines also state that the "federal courts have the power to acknowledge tribes through litigation." These generalized references in the Guidelines, which are similar to the Congressional findings in the List Act, appear to simply be a reflection of the historical practice of the political branches – prior to establishing any regulations, criteria, or procedures for recognition – to adopt on an *ad hoc* basis judicial determinations of tribal status resulting from a particular litigation. This historical practice of the political branches relying on such court decisions, however, does not lead to the conclusion that courts possess this inherent power; to the contrary, no constitutional or statutory provision provides such authority. Thus, when the Department of the Interior (with power delegated by Congress) chose to abandon this practice of relying on *ad hoc* judicial determinations of recognition and, instead, created a clear process for federal recognition through the Executive Branch, courts had no power to disregard such process. *See Western Shoshone Business Council*, 1 F.3d at 1056 ("[W]e conclude that the limited circumstances under which ad hoc judicial determinations of recognition were appropriate have been eclipsed by federal regulation."). As the Court recognized in *Western Shoshone Business Council*, courts that failed to defer questions of federal tribal recognition to Interior did so prior to or immediately following passage of the this regulatory process:

Other relatively recent cases in which courts did not defer to the Department's acknowledgment procedures either predate the regulations entirely, *see Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir. 1975), or were decided only shortly after the regulations were promulgated, *see Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 581 (1st Cir. 1979) ("the Department does not yet have prescribed procedures and has not been called on to develop special expertise in distinguishing tribes from other groups of Indians").

1 F.3d at 1057. Relatedly, courts have observed that, after passage of the regulations, it is abundantly clear that the judiciary should not intervene before exhaustion of the administrative procedures has taken place. *See James*, 824 F.2d at 1138 ("We believe that the time for a different conclusion has come; the Department has been implementing its regulations for eight years. . . . Moreover, the factual record developed at the administrative level would most assuredly aid in judicial review should the parties be unsuccessful in resolving the matter; in the event that the dispute is resolved at the administrative level, judicial economy will be served. All of these facts weigh in favor of requiring exhaustion in this case."). In fact, where courts have addressed the issue of tribal status – as in *Golden Hill*, discussed *supra* – the inquiry was largely limited to application of specific statutes, and was not meant to encompass recognition for purposes of obtaining federal benefits, such as a

government-to-government relationship. *See, e.g.*, *Montoya*, 180 U.S. at 270 (analyzing whether group of Indians was "tribe" for purposes of Indian Depredation Act); *Candelaria*, 271 U.S. at 563 (analyzing whether group of Indians was "tribe" for purposes of NIA). Indeed, this distinction between federal tribal recognition and judicial determinations for a particular case is perhaps most apparent in cases where, after courts found insufficient basis for tribal recognition in a particular case, the BIA nevertheless conferred federal tribal status on the same tribe. For instance, in *Mashpee Tribe v. Town of Mashpee*, a jury found that plaintiff was not a "tribe" for NIA purposes, *see* 447 F. Supp. 940 (D. Mass. 1978), *aff'd* 592 F.2d 575 (1st Cir. 1979), but Interior accorded plaintiff federal tribal status in 2007. 72 F.R. 8007 (Feb. 22, 2007). The same sequence of events transpired in 1996 with respect to the Samish Indian Tribe. *See United States v. Washington*, 641 F.2d 1368, 1374 (9th Cir. 1981) (affirming district court's finding that group of Indians was not a tribe for purposes of treaty rights); 61 F.R. 15825 (Apr. 9, 1996) (conferring federal recognition on same group of Indians).

In sum, the Court rejects the Nation's argument that, on the basis of alleged prior recognition by all three branches of government, plaintiff may bypass the political question doctrine.[12] At this juncture, the APA

bars judicial review of claims one and three in the complaint because Interior has not made a final determination of the Nation's federal tribal status. The Court will not, by pure judicial fiat, provide relief made unavailable to plaintiff at this juncture under the United States Constitution.[13] *See Burt Lake Band of Ottawa and Chippewa Indians*, 217 F. Supp. 2d at 78 (granting motion to dismiss claim brought by tribe seeking "to completely bypass the BIA's recognition process," where tribe argued on basis of historical evidence that Executive Branch had already conferred such recognition, because tribe had to exhaust

---

[12] Relatedly, therefore, the Court rejects plaintiff's assertion, described *supra*, that Interior's ongoing failure to put the Nation on the list in itself constitutes final agency action subject to the Court's review at this juncture. The Court is aware, as the Second Circuit recently confirmed, that the APA "requires a reviewing court to 'compel agency action unlawfully withheld.'" *Sharkey v. Quarantillo*, No. 06-1397-cv, 2008 U.S. App. LEXIS 18793, at *16 (2d Cir. Sept. 3, 2008) (quoting 5 U.S.C. § 706(1)). However, as plaintiff explicitly recognized in its opposition papers, such review would be available here only if Interior has "refus[ed] to take action Interior is legally required to take." (Pl.'s Mem. at 23.) Hence, plaintiff's argument is, again, necessarily premised on its assertion that the Nation has already been federally recognized by all three branches of government and, therefore, that Interior is legally bound to place the Nation on the list. As stated above, however, the Court has rejected this assertion. Thus, plaintiff has failed to demonstrate the existence of a final agency action reviewable at this juncture under the APA with respect to claims one and three.

[13] By the same token, of course, the APA enables the Nation to obtain judicial review of its petition – if necessary – after obtaining a final determination by Interior. As the Second Circuit has held, "[w]e begin with the strong presumption that Congress intends judicial review of administrative action." *Sharkey*, 2008 U.S. App. LEXIS 18793, at *17 (citation and quotation marks omitted). In keeping with the holding of the Second Circuit in *Golden Hill* and the overwhelming number of other courts to consider the question, however, the Court simply concludes herein that it cannot undertake such review at this juncture pursuant to the strictures of the political question doctrine and the finality principle embodied in the APA.

BIA's administrative process before obtaining judicial review).

As described *supra*, in claim two of the complaint, the Nation challenges Interior's failure to investigate and join in a land claim filed by plaintiff in 2005, in accordance with Interior's alleged trust responsibilities to the Nation under the NIA. As the Court sets forth below, this claim is dismissed for lack of jurisdiction pursuant to the APA because Interior did not take final agency action with respect to this request.

The NIA states that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177. In other words, as the Court explained above, the NIA essentially prohibits "the sale by Indians of any land unless the sale was by public treaty made under the authority of the United States." *Golden Hill*, 39 F.3d at 56. Further, the NIA "created a trust relationship between the federal government and American Indian tribes with respect to tribal lands covered by the Act." *Golden Hill*, 39 F.3d at 83; *see also Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 379 (1st Cir. 1975) ("That the Nonintercourse Act imposes upon the federal government a fiduciary's role with respect to protection of the lands of a tribe covered by the Act seems to us beyond question. . . ."). In addition, the Court recognizes that this trust relationship entails a "corresponding federal duty to investigate and take such action as may be warranted in the circumstances." *Joint Tribal Council of the Passamaquoddy Tribe*, 528 F.2d at 379.

According to the complaint, the Nation filed suit on June 15, 2005 in the Eastern District of New York, alleging that plaintiff ceded land to the Town of Southampton in 1859 without the consent of the United States and, therefore, in violation of the NIA. (Compl. ¶¶ 72, 78.)[14] Subsequently, by letter dated December 20, 2005 "to the Secretary of the Interior and the Attorney General of the United States, the Nation formally in writing requested that the United States intervene as a plaintiff in the 2005 Land Claim Lawsuit and bring suit on behalf of the Nation seeking relief for the loss of the Nation's lands in 1859 in violation of the [NIA]" (the "2005 litigation request"). (Compl. ¶ 79.)

Interior responded by letter dated February 13, 2006 (the "February 2006" letter). (Compl. ¶ 80.) This letter, which plaintiff attached to the complaint, states as follows:

> At my meeting with you and your representatives on January 19, 2006, you discussed the Shinnecock petitioner's tribal status and I agreed to review certain documents and analyses that you offered to submit concerning this matter. . . .
>
> With respect to your request for the United States to intervene as a plaintiff to assist

---

[14] This litigation related to the 2005 land claim is distinct not only from the instant action, but also from the casino litigation discussed *supra*.

the Shinnecock petitioner in its New York land claim, you assert that the United States is required to do so by virtue of its trust obligation owed to the Shinnecock and the [NIA]. The Department disagrees. Presently, there is no established trust obligation between the United States and the Shinnecock petitioner because the Department does not consider the Shinnecock petitioner to be an Indian tribe. Until the Department evaluates the evidence through the acknowledgment process, the Department does not know if your group meets the regulatory criteria to be acknowledged as an Indian tribe.

While the Department must consider any request by an Indian tribe to recommend land claim litigation, the [NIA] does not require the United States to intervene in land claims litigation or to initiate such litigation. Instead, the Department considers requests to litigate in concert with the Department of Justice. A host of factors are reviewed and considered by both agencies in making such a decision. At this time, the Department has yet to receive any historical records concerning the merits of the land claim you allege. United the Departments develop our own records on the matter, it is premature to consider intervention in your litigation.

(Pl.'s Exh. O.)

As a threshold matter, defendants argue that the principle stated in *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995) – namely, that "agency refusals to institute investigative or enforcement proceedings are presumed immune from judicial review. . . .", 56 F.3d at 1481 – operates to completely preclude judicial review over claim two in this case. However, the Court need not decide that issue because, even assuming *arguendo* that judicial review over such refusals is generally permitted, the Court has determined that it lacks jurisdiction over claim two pursuant to the APA because Interior never took final agency action on the 2005 litigation request.

Specifically, as the Court explained *supra*, only a "final" agency action is judicially reviewable under the APA. Here, after carefully reviewing the complaint and the documents appended thereto, including the February 2006 letter, the Court concludes that Interior took no judicially-reviewable final action with respect to the 2005 litigation request. In particular, although the February 2006 letter explicitly states Interior's intention to consider the merits of the Nation's litigation request and review any material the Nation submitted in support thereof, nowhere in the complaint does plaintiff allege that the Nation either (1) supplied the factual documentation specifically requested by Interior, or (2) notified Interior that the Nation was refusing to submit such additional documentation.[15] Under these circumstances,

---

[15] Moreover, to the extent plaintiff argues that Interior was legally required to investigate the 2005 litigation request and failed to do so, thus "withholding" agency action under the APA, the

it is beyond cavil that Interior had not completed its "decision-making process" in satisfaction of the APA and, thus, never took final action with respect to the 2005 litigation request that the Court may review under the APA. Pursuant to the APA, therefore, claim two in the complaint is dismissed for lack of jurisdiction.[16]

## VI. THE UNREASONABLE DELAY CLAIM SURVIVES DEFENDANTS' MOTION

As stated *supra*, in claim four of the complaint, the Nation alleges that Interior violated and continues to violate the APA and the Part 83 regulations by unreasonably delaying Interior's decision on the Nation's Federal Acknowledgment Petition for many years. Defendants move to dismiss this claim on the grounds that Interior is complying with the regulations. Essentially, defendants argue that the petition is not yet in "active consideration" and, thus, Interior has no duty to evaluate it at this time. (Defs.' Mem. at 28.) However, after carefully reviewing the complaint, the Court declines to hold at this juncture – *i.e.,* before plaintiff has had the opportunity to conduct any discovery – that Interior's failure to issue a final determination on the Nation's petition for at least ten years[17] is reasonable as a matter of law under the circumstances of this case. As the Court sets forth below, therefore, the Nation has alleged sufficient facts to defeat defendants' motion to dismiss claim four.[18]

---

Court rejects that assertion. In *Passamaquoddy Tribe* – a case upon which plaintiff relies heavily in opposition to dismissal of count two of the complaint – the court emphasized that the trust relationship entails a "corresponding federal duty to investigate and take such action as may be warranted *in the circumstances*," 528 F.2d at 379 (emphasis added), and, moreover, that "it would be inappropriate to attempt to spell out what duties are imposed by the trust relationship. . . . It is now appropriate that the departments of the federal government charged with responsibility in these matters should be allowed initially at least to give specific content to the declared fiduciary role," *id.* Thus, the court in *Passamaquoddy Tribe* declined to hold that the government was obligated to litigate on behalf of the Passamaquoddy, holding merely that the government "may not decline to litigate on the sole ground that there is no trust relationship," *id.*, in rejecting a litigation request. Here, the Court similarly declines, as a matter of law and under the circumstances of this case, to impose a legal duty upon Interior to continue investigating a litigation request when the Nation refused to participate in the investigation despite a written request for specific records from Interior.

[16] To the extent that plaintiff also bases claim two on defendants' alleged failure to assent to a separate litigation request the Nation made in 1978, such a claim would be dismissed on timeliness grounds pursuant to 28 U.S.C. § 2401, which provides a six-year statute of limitations for suits against the United States. 28 U.S.C. § 2401(a).

---

[17] As described *supra*, the Nation alleges that it initially petitioned for recognition in 1978, but submitted a new petition in 1998 pursuant to revised regulations by Interior. According to Interior, because these revised regulations "changed the provisions concerning the sequence of processing documented petitions," (Defs.' Reply at 8), the only relevant petition for purposes of the instant motion is the second petition filed in 1998. In fact, defendants also argue that the Nation did not petition for recognition in 1978, but merely made a litigation request. (Defs.' Reply at 8.) In any event, even assuming *arguendo* that the sole relevant period of alleged delay began in 1998, the Court has determined, as set forth *infra*, that plaintiff has adequately alleged a claim of unreasonable delay to survive a motion to dismiss.

[18] The Court rejects as a threshold matter, however, plaintiff's argument that any

## A. Legal Standard

As the Second Circuit has recognized, "Section 6(b) of the [APA] requires that an agency conclude proceedings 'within a reasonable time.'" *Reddy v. Commodities Futures Trading Comm'n*, 191 F.3d 109, 120 (2d Cir. 1999) (quoting 5 U.S.C. § 555(b)); *see also Khdir v. Gonzales*, No. 07-cv-00908, 2007 WL 3308001, at *6 (D. Colo. Nov. 6, 2007) ("Where . . . there is no set deadline for an agency to complete a legally-required action, the APA provides a requirement that it do so within a reasonable time."). Consequently, as the Supreme Court has confirmed, the APA provides that federal courts may "compel agency action unlawfully withheld or unreasonably delayed." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (quoting 5 U.S.C. § 706(1)). "Moreover, where delay of administrative remedy is at issue, the lack of a final order by the agency, which might otherwise engender a question about ripeness, does not preclude this court's jurisdiction." *Muwekma Tribe v. Babbitt*, 1433 F. Supp. 2d 30, 34 (D.D.C. 2000) (citing *Trac*, 750 F.2d at 75).

"Resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003). In particular, in determining whether an agency's delay is reasonable, courts consider the following factors, known as the "*TRAC* factors":

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*Tummino v. Von Eschenbach*, 427 F. Supp. 2d 212, 231 (E.D.N.Y. 2006) (citing *In re Barr Laboratories*, 930 F.2d 72, 74-75 (D.C. Cir. 1991) and quoting *Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (hereinafter, "*Trac*")); *see also Loo v. Ridge*, No. 04-CV-5553, 2007

---

unreasonable delay the Nation has allegedly experienced excuses plaintiff from completing the administrative process for purposes of obtaining judicial review of the merits of the Nation's petition for recognition, (*see* Pl.'s Mem. at 32-33); the obstacles posed at this juncture by the APA's finality principle and the political question doctrine are wholly separate from the question of unreasonable delay. *See Burt Lake Band of Ottawa and Chippewa Indians*, 217 F. Supp. 2d at 79 (rejecting plaintiff's argument "that a party can forego administrative remedies simply because it believes the process is taking unreasonably long").

U.S. Dist. LEXIS 17822, at *14 and n.4 (E.D.N.Y. Mar. 14, 2007) (applying *Trac* factors); *Nat'l Resources Defense Council, Inc. v. Fox*, 93 F. Supp. 2d 531, 543-48 (S.D.N.Y. 2000) (same). The "issue cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee Wampanoag Tribal Council, Inc.*, 336 F.3d at 1102 (remanding case to district court, where plaintiff tribe alleged unreasonable delay in the BIA's review of recognition petition, because district court did not fully consider *Trac* factors); *see, e.g., Muwekma*, 133 F. Supp. 2d at 32-33 (agreeing with plaintiff that Interior had unreasonably delayed tribe's petition for federal recognition after applying *Trac* factors where petition had been pending for approximately five years).

## B. Application

Here, as described *supra*, the Nation alleges that its petition has been pending without reasonable cause since at least 1998, *i.e.,* for approximately ten years, despite plaintiff's compliance with Interior's Technical Assistance Requests for additional information related to the petition. In addition, the complaint alleges that Interior has estimated that it may not issue a final determination until 2014, and will not even bind itself to that time limit. According to the complaint, the Nation's prolonged absence on the list has caused plaintiff not only substantial economic harm, but has also deprived plaintiff from participating in various government services to which federally-recognized tribes are entitled, including health, education, housing,

substance abuse, child, and family services. (*See* Compl. ¶¶ 142-44.) After reviewing the allegations in the complaint – and particularly in light of the highly fact-based, nuanced review required for unreasonable delay claims according to the *Trac* factors – the Court declines to conclude as a matter of law at the motion to dismiss stage that Interior has been reasonable in letting at least ten years elapse without issuing a final decision on the Nation's petition.[19] The Nation has adequately pled an unreasonable delay claim and, therefore, defendants' motion to dismiss that claim is denied.[20]

---

[19] As discussed in greater detail *supra*, subsequent to briefing this motion, Interior promulgated a new waiver policy that, according to defendants, could render review of the unreasonable delay claim unnecessary because the policy could put the Nation at the top of the "Ready" list and place them under active consideration in the late fall of 2008. However, to date, despite the Court's urging, the parties have been unable to resolve the question of the Court's oversight regarding the acknowledgment process, including the extent to which any timetable agreed upon by the parties would be binding on Interior. In light of the Court's denial of Interior's motion to dismiss the unreasonable delay claim, the Court will conduct a telephone conference on October 7, 2008 at 4:30 p.m. in order to discuss these matters.

[20] The Court notes that, to the extent the Nation successfully demonstrates unreasonable delay, the Court would not usurp the recognition decision from Interior, but may require Interior to adhere to a reasonable deadline for issuing a final determination on the Nation's petition. *See, e.g., Muwekma v. Norton*, 206 F. Supp. 2d 1, 3 (D.D.C. 2002) (refusing to vacate prior order setting deadline for BIA to issue final determination on tribe's petition for federal recognition).

## VII. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint is granted in its entirety pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure with the exception of claim four. The parties shall have a telephone conference with the Court on October 7, 2008, at 4:30 p.m., in order to discuss how the "unreasonable delay" claim should proceed.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: September 30, 2008
Central Islip, NY

\* \* \*

Plaintiff is represented by Evan A. Davis, Esq., Christopher H. Lunding, Esq., and S. Christopher Provenzano, Esq. of Cleary, Gottlieb, Steen & Hamilton, One Liberty Plaza, New York, New York, 10006, as well as by John M. Peebles, Esq., Steven J. Bloxham, Esq., and Darcie L. Houck, Esq., of Fredericks, Peebles & Morgan LLP, 1001 Second Street, Sacramento, California, 95814. Defendants are represented by Kevin P. Mulry, Esq. of the United States Attorney's Office, 271 Cadman Plaza East, Brooklyn, New York, 11201.